1997–NMCA–020

934 P.2d 300

**Carol S. LEVENSON, Plaintiff–Appellant,**

v.

**Rozella HAYNES, Individually, as Beneficiary, Distributee, Trustee, and Personal Representative of the Estate of Kenneth Haynes, Defendant–Appellee.**

No. 16838.

Court of Appeals of New Mexico.

Feb. 11, 1997.

Certiorari Denied April 8, 1997.

Alice Tomlinson Lorenz, Dean G. Constantine, Miller, Stratvert, Torgerson & Schlenker, P.A., Albuquerque, for Plaintiff–Appellant.

Keith S. Burn, Clara Ann Bowler, Keith S. Burn, P.A., Albuquerque, Linda S. Bloom, Linda S. Bloom, P.A., Albuquerque, for Defendant–Appellee.

## OPINION

DONNELLY, Judge.

1. Plaintiff, Carol S. Levenson, appeals from a decision of the trial court, denying her

suit to enforce a guaranty against Rozella Haynes, individually, and in her official capacity as the trustee and personal representative of the Estate of Kenneth Haynes, her deceased husband. Plaintiff has raised nine issues on appeal. We consolidate Plaintiff's several issues as follows: (1) whether the trial court erred in modifying the ruling of a prior judge; (2) whether the trial court erred in finding that there were material changes in the commercial lease that voided a guaranty; (3) whether the findings of the trial court are supported by substantial evidence; and (4) whether the trial court erred in dismissing Plaintiff's claim against the Estate of Kenneth Haynes, and Plaintiff's claims against Defendant in her capacity as personal representative, beneficiary, distributee, and trustee of the decedent's estate. We affirm.

*FACTS AND PROCEDURAL POSTURE*

2. The business dealings between the parties, which gave rise to this litigation, are complex and involve a series of interrelated transactions. Following negotiations between the parties, Rozella Haynes (the Guarantor) and Kenneth Haynes, her husband (the Guarantors), entered into a "build and sell" agreement with Plaintiff and her former husband, Robert Levenson, on August 21, 1980, whereby the Guarantors agreed to build a commercial building in Albuquerque, New Mexico, and Plaintiff and Robert Levenson agreed to purchase the building for the sum of $1,100,000. Contemporaneous with this agreement, Supermarkets of New Mexico, Inc. (Supermarkets) entered into a lease to rent the property effective upon completion of the building.

3. As an inducement to Plaintiff and Robert Levenson to enter into the lease with Supermarkets, the Guarantors, who owned a controlling interest in the Supermarkets corporation, personally guaranteed compliance with the terms of the lease by Supermarkets or any of its assignees. Plaintiff and Robert Levenson also granted to Kenneth Haynes an option to purchase the land and store premises for $785,000, which option could be exercised during a six-month period in the fifteenth year following the commencement of the lease term.

4. Following execution of the lease, Supermarkets assigned its interest in the lease to Bag 'n Save, a subsidiary. In 1981 Kenneth Haynes assigned his interest in the option to Marken, a partnership consisting of his brother, Martin Haynes, and himself. Thereafter, in April 1983 Bag 'n Save assigned its rights in the lease to BNS Foods, a subsidiary of Furr's, Inc. BNS subsequently changed its name to Rubus Realty Company (Rubus).

5. Under the terms of the lease, Supermarkets and its subsequent assignees were obligated to pay Plaintiff and Robert Levenson rent for the leased premises on a triple net rental basis, the sum of $13,500 per month for a period of thirty-six months, and thereafter, during the initial term of the lease, the lesser amount of either $16,000 per month, or an amount equal to "($2,000.00) more than the [Lessors'] monthly installment of principal and interest on the permanent financing the [Lessors use] to purchase the leased premises, (the 'Permanent Mortgage')." The lease additionally specified that:

> The Permanent Mortgage presently contemplated by [Lessors] is to be supplied by American Savings and Loan Association [hereinafter American] ... and will have a variable interest rate ranging from a minimum of 13% per year to a maximum of 16% per year, the rate to be redetermined every 3 years. The redetermination will set the rate at the "prime commercial rate" then being charged by [American]. Such prime commercial rate is to be one percentage point in excess of the prime fixed rate for 80% or better loan-to-value loans being charged by [American] at the time of redetermination.

6. In 1984 Robert Levenson was notified by American that it would raise the interest rate on its mortgage. Rubus and Kenneth Haynes were also notified of the proposed adjustment in the interest rate. Robert Levenson decided to prepay the mortgage held by American prior to any adjustment in interest and to obtain a new loan from Liberty National Bank (Liberty) in the principal

amount of $1,250,000 at a fixed 10% rate of interest. The new loan was obtained on April 2, 1984. In negotiating the new loan and refinancing the amount of the note and mortgage, Robert Levenson and Plaintiff consolidated other debts owed by them, and the principal amount of the loan was increased. They used $1,106,450 of the proceeds from the new loan to pay off American, including a $35,000 prepayment penalty, and the balance was retained by Robert Levenson for his personal use.

7. Plaintiff and Robert Levenson did not use the new loan as the basis for calculating the adjusted monthly rental. Instead, they notified Rubus and the Guarantors of the refinancing and that the monthly rental would be $15,605.48, based upon a proposed adjustable rate increase in the American note, including an additional $2,000 per month. Rubus did not object to the refinancing or the adjustment in rent. No written consent to the refinancing, the increase in the amount of the principal or the change in the calculation of monthly rental payments, however, was ever given by the Guarantors. Shortly after the refinancing, American became insolvent and filed for bankruptcy. Kenneth Haynes died in 1985.

8. Plaintiff and Robert Levenson were divorced in 1988. Under the terms of the divorce decree, Plaintiff acquired all rights as lessor under the lease and guaranty agreement. In January 1993 Rubus, the current lessee, vacated the leased premises and notified Plaintiff that it intended to file for reorganization under Chapter 11 of the Bankruptcy Code. Following the initiation of the bankruptcy proceedings on March 16, 1993, the bankruptcy court rejected the lease held by Plaintiff. Plaintiff made a demand upon the Guarantor to honor the guaranty, but the Guarantor refused. Thereafter, Plaintiff filed suit seeking to enforce the guaranty based on the default of Rubus. The case ultimately proceeded to trial without a jury before Judge W. Daniel Schneider. The trial court, by a letter decision, announced that it found that the Guarantor was not liable on the guaranty. The trial court subsequently denied Plaintiff's motion for rehearing and entered judgment in favor of the Guarantor.

*MODIFICATION OF PRIOR ORDER*

9. The parties filed cross-motions for summary judgment. Plaintiff's motion asserted that the change in the monthly installment payment and increase in the principal amount of the new loan did not constitute a change in the lease. The Guarantor's motion asserted that there had been a "change, modification or alteration" in the lease which voided the guaranty because the terms of the permanent mortgage had been modified without the Guarantor's consent. Following a hearing, the judge initially assigned to hear the case denied both motions, ruling that there were "genuine issues of material fact herein," and that the change in the amount of the monthly rental payments did not void the guaranty.

10. The case was later assigned to Judge Schneider. Plaintiff argues that the ruling of Judge Schneider improperly vacated the order of the prior judge and improperly overturned his ruling that there had been no change in the lease. We see no error in the modification of the prior order under the circumstances presented here. The initial order entered by the first judge expressly found that material issues of fact precluded the granting of summary judgment, and the subsequent judgment entered by Judge Schneider was entered following a trial on the merits in order to resolve the disputed factual issues. The initial order denying the cross-motions for summary judgment was interlocutory in nature and was subject to modification or reconsideration following a trial on the merits in order to resolve the disputed issues. *See Tabet Lumber Co. v. Romero,* 117 N.M. 429, 431, 872 P.2d 847, 849 (1994) ("The grant or denial of a motion for summary judgment is an interlocutory order, and, therefore, the district court could properly reconsider its previous ruling notwithstanding the fact that a different judge had issued that ruling.") (citation omitted); *cf. Melnick v. State Farm Mut. Auto. Ins. Co.,* 106 N.M. 726, 727, 749 P.2d 1105, 1106 (1988) (denial of motion for directed verdict is interlocutory in nature and trial court may revise or rescind such order at any time before entry of final judgment). *See generally* 7

James Wm. Moore et al., *Moore's Federal Practice* ¶ 60.20 (2d ed. 1996) ("Interlocutory orders and judgments are not within the provisions of [Rule] 60(b), but are left within the plenary power of the court that rendered them to afford such relief from them as justice requires.").

*WAS THERE A CHANGE IN THE LEASE?*

11. Plaintiff argues that the trial court erred in its interpretation of the lease and in adopting its conclusion that there were changes in the lease not agreed to by the Guarantors, which voided the guaranty. In adopting its findings of fact, the trial court found, among other things:

8. Having been executed at the same time, the Build and Sell Agreement, the Lease, the Guarantee and the Option were part of the same transaction, and intended to be one contract.

. . . .

13. The lease payment portions of the Lease, were intended to provide benefits and protections to both Plaintiff and [the Guarantor].

14. The tenant was protected at the upper end by a $16,000 per month cap, and the landlord was otherwise guaranteed a $2,000 per month profit on the principal and interest payment on the permanent financing used for the purchase.

15. The intent of the Agreement as expressed in the Lease was that whatever occurred would be to the benefit of the parties.

. . . .

19. The Lease provides that, after the first three years of the Lease term, monthly rent for the Property shall be the lesser of $16,000 per month or an amount each month equal to $2,000 more than the Landlord's monthly installments of principal and interest on a $1,100,000 permanent mortgage loan amortized over a 20 year period.

20. Monthly principal and interest payments on a $1,100,000 mortgage loan at 10% interest amortized over 20 years are $10,615.24 each.

21. After the Levensons' execution of the Liberty note, rent for the remainder of the Lease should have been $12,615.24 per month.

22. The Levensons actually charged Rubus Realty Company . . . [the] tenant of the Property . . ., monthly rent of $15,-605.48 from April, 1983 through January, 1993.

23. By increasing the amount borrowed, the value of the Option was decreased.

24. The Guarantee stated and intended that the Landlord and Tenant have no authority to make any changes, modifications and alterations in the . . . lease without the express written consent of the guarantors, otherwise the guarantors shall be relieved of their guarantee thereunder.

25. Neither [the Guarantor] nor her husband gave express written consent to any changes, modifications or alterations in the Lease.

26. The increase in the amount of the principal of the permanent mortgage financing of the Property, the fact that the benefit of the lower interest rate on the refinanced note was not passed on to the tenant, and the decreased value of the Option were material changes in the Agreement. . . .

12. Based on its findings, the trial court concluded that the guaranty was voided and that the Guarantors were released from liability thereon. Plaintiff challenges these findings and conclusions of the trial court, arguing that the guaranty signed by the Guarantors did not prohibit a refinancing or early payoff of the original mortgage, and that the trial court erred in determining that the separate agreements should be treated as one agreement.

13. In reviewing Plaintiff's challenges concerning the trial court's findings and conclusions, unless they are determined to be clearly erroneous or deficient, we view the facts underlying the trial court's decision in the light most favorable to the prevailing party and disregard all evidence and inferences to the contrary. *Guaranty Nat'l Ins. Co. v. C de Baca*, 120 N.M. 806, 809, 907 P.2d

210, 213 (Ct.App.1995). We review conclusions of law adopted by the trial court de novo. *Mark V, Inc. v. Mellekas*, 114 N.M. 778, 782, 845 P.2d 1232, 1236 (1993). In considering Plaintiff's arguments relating to the meaning ascribed to documentary evidence, we are also mindful that the touchstone for interpreting a written agreement is to ascertain and apply the intent of the parties. *Boatwright v. Howard*, 102 N.M. 262, 264, 694 P.2d 518, 520 (1985).

14. As observed in *City of Clovis v. Southwestern Public Service Co.*, 49 N.M. 270, 279, 161 P.2d 878, 883 (1945), as a general rule, absent evidence indicating a contrary intention, " 'instruments executed at the same time, by the same parties, for the same purpose, and in [the] course of the same transaction, are, in the eye of the law, one instrument, and will be read and construed together....' " (Quoting 6 Ruling Case Law, *Contracts* § 240, at 851 (1915).) *See also Master Builders, Inc. v. Cabbell*, 95 N.M. 371, 373, 622 P.2d 276, 278 (Ct.App. 1980). At trial, Ben Spencer, a witness called by the Guarantor, testified that the lease, option, and permanent mortgage were part of the same transaction. Robert Levenson testified that the documents were all part of the original transaction and consisted of "an agreement to build the building, for me to buy it back, or to buy it, to lease it back to them, and there was an option agreement." This evidence supports the trial court's findings that the guaranty and lease agreement were intended by the parties to be interlinked and that changes in the provisions of the lease which were not agreed to by the Guarantors in writing voided the guaranty.

15. The trial court found that after Plaintiff and Robert Levenson renegotiated the new note and mortgage, the "rent for the remainder of the Lease should have been $12,615.24 per month," and that "[t]he Levensons actually charged ... [the tenant], monthly rent of $15,605.48 from April, 1983 through January, 1993." Additionally, the trial court found that the increase in the principal amount refinanced by the landlord and the fact that "the benefit of the lower interest rate on the refinanced note was not passed on to the tenant," amounted to material changes in the agreement which were not agreed to by the Guarantors.

16. Plaintiff seeks to counter these findings by arguing, among other things, that it was error to find that the refinancing had the effect of discharging the Guarantors, because the lease expressly permitted changes in the amount of rent every three years, and that the amount of the rent increase adopted by Plaintiff and Robert Levenson was consistent with the rent index specified in the lease and the American note and mortgage. Thus, she reasons that there was no material change in the lease nor any resulting prejudice imposed upon the Guarantors. The lease stated that "[t]he monthly installment shall be based upon an amortization of the principal sum of $1,100,000"; the new mortgage with Liberty was for $1,250,000. Plaintiff, although conceding that the refinancing and replacement of the permanent mortgage resulted in an increase in the principal amount of indebtedness, argues that this act did not constitute a material change in the lease because the amount of interest payable under the new note and mortgage was lowered, that the Guarantors remained only liable for the amount of the original indebtedness, and that the increase in rent was within the amount contemplated by the terms of the lease and the original adjustable rate mortgage note of American. We believe these arguments must fail.

17. We think it is clear that the refinancing of the original note and mortgage, substantially increasing the principal amount of the underlying note and mortgage, and the change in the basis for computing the lease payments, without the express written consent of the Guarantors, constituted changes or modifications of the lease agreement, which voided the guaranty.

18. The traditional rule under general suretyship law was that a guarantor was completely discharged by any modification of the underlying obligation. Restatement (Third) of Suretyship and Guaranty § 41, Reporter's Note, at 189 (1996). Later decisions further refined the rule, however, to hold that a guarantor was discharged by a material change in the underlying obligation to which the guarantor did not consent. *See*

*Federal Deposit Ins. Corp. v. Moore,* 118 N.M. 77, 81, 879 P.2d 78, 82 (1994); *Western Bank v. Aqua Leisure, Ltd.,* 105 N.M. 756, 757, 737 P.2d 537, 538 (1987); *see also* Restatement (First) of Security § 128 & cmt. f (1941) (recognizing different rules for compensated sureties and other sureties). The Restatement (Third) of Suretyship and Guaranty, Section 41, adopts a different rule, under which a guarantor who is not a compensated surety is less easily discharged. Under the ·Restatement (Third) of Suretyship and Guaranty, any guarantor, whether compensated or not, is generally discharged "only to the extent it would otherwise suffer loss as a result of the modification." *Id.* § 41, Reporter's Note, at 189.

■ 19. We need not consider the application of this provision of Restatement (Third) of Suretyship and Guaranty to the facts before us, however, because the specific language in the guaranty agreement shows that the parties agreed to stricter restraints on modification than would be established by general suretyship law. *See Premier Bank, Nat'l Ass'n v. Mosbacher,* 959 F.2d 562, 566 (5th Cir.1992). The language of the guaranty specifically stated in applicable part: *"[T]he Landlord and Tenant have no authority to make any changes, modifications and alterations in the foregoing lease without the express written consent of the undersigned, otherwise the undersigned shall be relieved of their guarantee hereunder."* [1] (Emphasis added.) The parties to a suretyship arrangement are free to determine for themselves by contract the effect of suretyship status and the duties and obligations which follow. Restatement (Third) of Suretyship and Guaranty § 6. The language of the written guaranty agreement governs the rights of the Guarantors. *See Federal Deposit Ins. Corp.,* 118 N.M. at 81, 879 P.2d at 82; *see also Smith v. Price's Creameries, Div. of Creamland Dairies, Inc.,* 98 N.M.

541, 545, 650 P.2d 825, 829 (1982) (terms of contract made by parties govern their rights and duties). As observed in *Shirley v. Venaglia,* 86 N.M. 721, 724, 527 P.2d 316, 319 (1974), a guarantor is similar to a surety, is a favorite of the law, is entitled to a strict construction of his agreement, and "his liability is not to be extended by implication beyond the express limits or terms of the instrument, or its plain intent." (Internal quotation marks omitted; quoting 24 Am.Jur. *Guaranty* § 71, at 158 (Supp.1962).) *See also Federal Deposit Ins. Corp.,* 118 N.M. at 80, 879 P.2d at 81.

20. Because the initial note held by American, and the indebtedness evidenced thereby, was refinanced, the adjustable rate note and the index for computing lease payments in accordance with the terms of the lease no longer existed. Therefore, for the majority of the remaining period under the term of the lease, there was, in fact, no mechanism agreed upon by the parties which authorized the Lessors to make adjustments in the interest rate and the amount of the monthly lease payment, absent the Guarantors' consent. The lease provision specifying the method for calculating the monthly rental payments was an integral provision of the lease and this provision was inextricably tied to the underlying note and mortgage.[2] Thus, when Plaintiff and Robert ·Levenson refinanced the note and mortgage and substituted a note with a fixed interest rate and an increased principal indebtedness, and increased the lease payments based on a formula tied to the original note which was no longer in existence, these changes constituted changes in the underlying lease which were not agreed to by the Guarantors. These changes were significant enough to trigger the provision in the guaranty agreement that changes made without the Guarantors' consent would discharge them. *See*

1. The guaranty also provided that "the [Guarantors] will be deemed to have consented to any change, modification, or alteration which is in writing and signed by [the Guarantors], or either of them, personally, or on behalf of the Tenant, or on behalf of any assignee of the Tenant. The [Guarantors] also agree that they shall not be released from the obligations of this guarantee ... by any assignment of the lease."

2. Paragraph 6(D) of the lease provided in part that "[t]he monthly installment shall be based upon an amortization of the *principal sum of $1,100,000 together with interest thereon in equal monthly payments over a period of 20 years."* (Emphasis added.)

*First Nat'l Bank in Albuquerque v. Abraham,* 97 N.M. 288, 291, 639 P.2d 575, 578 (1982) (change in rate of interest is a material change in contract); *Citizens Bank v. Lair,* 687 S.W.2d 268, 270–71 (Mo.Ct.App. 1985) (increase in interest rate is material alteration of instrument which vitiates guaranty); *see also Fassett v. Deschutes Enters.,* 69 Or.App. 426, 686 P.2d 1034, 1037–38 (1984) (change in amount of rent contrary to agreement constitutes material change, thereby discharging guarantor).

■ 21. As a general rule, a change in the underlying agreement which materially modifies the legal effect of the instrument has the effect of discharging a guarantor from his or her obligation, unless the guarantor consents to the change. *Western Bank,* 105 N.M. at 757, 737 P.2d at 538; *see also Shirley,* 86 N.M. at 724, 527 P.2d at 319 (guarantor's participation or consent required to extend guaranty agreement); *Pacific Nat'l Agric. Credit Corp. v. Hagerman,* 39 N.M. 549, 553, 51 P.2d 857, 859 (1935) (unauthorized alteration which increases guarantor's liability releases guarantor from liability under the agreement).

■ 22. Plaintiff also argues that the trial court should not apply a strict rule of construction to the terms of the guaranty in the instant case because she asserts that the attorney for the Guarantors drafted the guaranty, the guaranty is ambiguous, and any ambiguity should be construed against the parties who drafted the instrument. *See Resolution Trust Corp. v. Ocotillo W. Joint Venture,* 840 F.Supp. 1463, 1482 (D.N.M. 1993) (ambiguity in contract construed against entity responsible for preparing instrument). Although Plaintiff correctly recites the general rule that any ambiguity contained in an agreement is generally construed against the party who drafted the instrument, there is no ambiguity in the language of the guaranty agreement here. *See Dozier v. Paterson Co.,* 648 So.2d 610, 612 (Ala.Civ.App.1994) (where language of guaranty is plain and exact, there is no ambiguity and legal effect constitutes question of law for court); *Modern Photo Offset Supply v. Woodfield Group,* 663 N.E.2d 547, 549 (Ind. Ct.App.1996). Absent a showing of ambigui-

ty, a court is required to interpret and enforce the contract according to the language and terms contained therein. *Montoya v. Villa Linda Mall, Ltd.,* 110 N.M. 128, 129, 793 P.2d 258, 259 (1990).

23. The agreement signed by the Guarantors cannot be characterized as a continuing guaranty which continues in effect irrespective of the refinancing of the note on which the lease rental was calculated. *See Valley Nat'l Bank v. Foreign Car Rental,* 157 Colo. 545, 404 P.2d 272, 275–76 (1965) (guaranty is continuing if it contemplates future course of dealing during an indefinite period or series of transactions); *see also* Restatement (Third) of Suretyship and Guaranty § 16. Notably absent from the language of the guaranty here was any provision authorizing the refinancing or modification of the permanent loan referred to in the lease. *Compare Premier Bank,* 959 F.2d at 566–67 (guarantor released from guaranty by lender's modification of loan without guarantor's approval, where guaranty specifically required lender to obtain guarantor's prior written consent) *with First Nat'l Bank in Albuquerque v. Energy Equities Inc.,* 91 N.M. 11, 15, 569 P.2d 421, 425 (Ct.App.1977) (guarantor not discharged from liability to bank where guaranty agreement expressly provided that guaranty covered renewals), *and Mann v. NCNB Tex. Nat'l Bank,* 854 S.W.2d 664, 667 (Tex.Ct.App.1992) (holding guarantor liable on renewal agreement which increased interest rate on loan, where guaranty agreement provided that guarantor consented to all future liabilities and changes in interest rates).

24. In sum, we conclude that the refinancing of the original note and mortgage so as to substantially change the basis provided in the lease agreement for indexing the amount of the lease rental constituted a change in the lease which was not consented to in writing by the Guarantors, as required by the express terms of the guaranty agreement. Hence, we affirm the trial court's conclusion that the Guarantors were entitled to be discharged from liability under the guaranty.

### SUFFICIENCY OF THE EVIDENCE

25. Plaintiff asserts that the trial court's Findings of Fact Nos. 13–15, and 23, relating

to the intent of the parties concerning the lease payment provisions and the effect of the refinancing on the value of the option, are not supported by substantial evidence. In advancing this contention, Plaintiff points to other evidence adduced at trial and argues that the trial court's findings are contrary to the language of the documentary evidence.

26. We believe that the testimony of both Robert Levenson and Spencer provided a proper factual basis for the trial court's finding that the buy and sell contract, the lease, the option, and the guaranty were essentially parts of a comprehensive general agreement. *See Master Builders*, 95 N.M. at 374, 622 P.2d at 279 (intent of parties may be determined from that manifested at time of contracting and viewed in light of surrounding circumstances). Robert Levenson testified he advised the attorney who drafted the lease, that the amount of rental after the first three years was to be $2,000 over the monthly mortgage payment, with the interest to be readjusted every three years. He also testified that had the original variable rate mortgage with American in the principal sum of $1,100,000 remained in force, it would have been readjusted to bear a 14% interest rate and the new monthly adjusted rate commencing in May 1984 would have been $13,605.48, plus $2,000. It is clear that the original note and mortgage was refinanced without the written consent of the Guarantors, and the foregoing testimony of Robert Levenson supports the trial court's findings concerning the general intent of the parties and the trial court's construction of the lease language governing the mechanism for calculating the amount of the monthly lease. Although Plaintiff argues that the opinion testimony of Spencer was effectively impeached on cross-examination, issues of credibility and the weight to be accorded a witness's testimony are factual issues to be resolved by the fact finder. *See Albuquerque Nat'l Bank v. Albuquerque Ranch Estates, Inc.*, 99 N.M. 95, 106, 654 P.2d 548, 559 (1982) (on appeal, reviewing court neither weighs conflicts in evidence nor determines credibility of witnesses).

27. The trial court also determined that, after Plaintiff and Robert Levenson executed the new mortgage, there was an increase in the amount of the permanent financing and the lower interest rate obtained on the refinanced note was not passed on to the tenant, and there was a decrease in the value of the option. Our review of the record also indicates that these findings are supported by substantial evidence and provide an additional basis for voiding the guaranty.

28. Because we find that there was sufficient evidence to support the trial court's findings that Plaintiff and Robert Levenson significantly modified the terms of the lease, without the express written consent of the Guarantor, thus voiding the guaranty, we need not address Plaintiff's arguments concerning the denial of damages, or her claims against the Estate of Kenneth Haynes or the testamentary trust.

*CONCLUSION*

29. The judgment of the trial court is affirmed.

30. IT IS SO ORDERED.

FLORES and WECHSLER, JJ., concur.

